May it please the court, I'm Diane Elderkin, I represent Dupuy Mitek the appellant. There's no legally sufficient evidentiary basis for the jury's verdict of non-infringement and that verdict is also contrary to the weight of credible evidence. Mitek presented evidence at trial on the right question on whether the coating on fiber wire affected the basic and novel properties of the Hunter invention as the district court defined those properties. That evidence was essentially unrebutted by Arthrex. What Arthrex did was present a flurry of evidence directed to the wrong question, directed to whether the coating on fiber wire affects properties of the product, the suture, not whether the coating affects the basic and novel properties of the invention. And for that reason the jury's verdict cannot stand. Now what were the basic and novel properties of the Hunter invention? The district court explained this in her Markman decision. She defined the basic and novel properties and she explained in her opinion that the using dissimilar yarns that were braided together so that they were in intertwining contact and a result of that was that the resulting braid had beneficial properties from those dissimilar yarns. She pointed out that the inventors explained in their patent that an important feature of this invention and one of the reasons that this braid achieved enhanced pliability was that the fibers in these dissimilar yarns were free to move with respect to one another. And so that when the suture is bent those fibers could move with respect to one another and you have enhanced pliability. And she pointed out again in her opinion that the inventors eschewed any mechanism that would have inhibited or impeded the ability of these fibers to move together. And her definition of the basic and novel properties of the invention takes into account and expresses this idea that it's these dissimilar yarns that are braided together in intertwining contact so as to provide a suture with these improved properties. But wasn't there evidence both with respect to the basic and novel properties of the overall suture and the basic and novel properties of the interwoven braided configurations? I'm not sure that I understand the question. My text's evidence was focused on whether the coating affected the ability of the constituent elements of the suture to provide enhanced properties as the patent calls for. That was what my text focused on. Our expert looked at the suture, determined whether the coating penetrated the braid and in any way impeded the fibers from moving with respect to one another. And that really was my question. Wasn't there contrary evidence presented on that very point? No, there really was not, Your Honor. Wasn't there evidence about whether the coating penetrated into the fibers? There was really no credible evidence on that. Let me point you to exactly what their expert said. First of all, their expert said one thing with respect to his opinion as to whether the coating did affect the basic and novel property. He said it didn't matter to him whether the coating penetrated the braid or not. And his testimony with respect to, he did have some rather general testimony. He said that the coating could have penetrated the braid, but he said, but I wouldn't hang my hat on that and it's always speculation. And that's in the record, I believe, at page 2071. That's the extent of what their expert said with respect to whether the coating penetrated the braid or not. And they have nothing, none of their witnesses testified in any way with respect to whether the coating in any way affected the ability of the constituent elements to contribute their unique properties to the braid. Instead, their experts answered the wrong question. They focused on what effect did this coating have on the product? Well, wasn't it the handleability of the product? And why is it unfair for them to focus on its use in practice where the orthopedic surgeons and their expert came in and said, you know, I can tie this knot much more easily, it's much smoother, you know, I give up some knot strength, but the handleability of this is changed from one that doesn't have the coating and one that does have the coating. And why is that unfair for them to focus on that? Because it looks to me like Judge Saris allowed that and then allowed it in the jury instruction and there was no objection by my tech, as I understand it, to the jury instruction. And I think the jury was kind of given the green light to look at handleability under the instructions that they were given and under the arguments because you got into this essentially consisting of kind of trap, in response to an office action, you moved for reasons other than coating, you moved to the language. But that brings you into a factual case under a case deal and PPG. So you got into that factual argument and there was, you know, there's 11 witnesses over six days and they're really fighting about handleability, it seems to me, most of the time. Why isn't that fair under the way the case went in? I think the confusion is that there are several things that contribute to the handleability of the suture. One of the things is recognized in the court's construction of the basic and novel properties. She says that the constituent elements contribute to the handleability and we know that from the story of how fiber wires developed that that indeed happened with them. When they made a suture that was all PET, it was too stiff. When they made one that was all PE, it didn't have good handleability, it had poor knot security. It was only when they combined them that they got this great product. Then they further enhanced handleability by putting on a coating, which is very well known in the art. It's ubiquitous to put coatings on braided sutures to smooth out the surface to make them even more handleable. So I think that may be where the confusion lies.  in her definition of the basic and novel properties, but in the context of what's contributing to that handleability, the braided construction. So we get the handleability, we take it this far with the invention, and then we further enhance it just as taught in the patent by putting on this ubiquitous silicon coating. So I can imagine it was easy for the jury to be confused. I believe they were confused and I believe that the verdict was wrong as a basis of that. But if there was confusion at trial, surely your witnesses clarified or explained or stated the contrary view. Your opponents make a strong statement in their brief of the evidence supporting the verdict. With all respect, I believe that the evidence that they refer to in their brief does not answer the wrong question. All of their evidence goes to these handleability properties. The types of properties you fully expect are going to be affected by putting a coating on a suture, making it more slippery, making it smoother. And no surprise, you answer the wrong question, you get the answer that they want, which, oh yes, the coating affects the handleability. But that does not affect the invention. They got to a certain level of handleability and pliability by using this novel braid structure. Why is it wrong to focus on the suture in the sense that the claim itself is to a suture? With all of these components and with all of these characteristics. But the invention, as claimed, is a suture. Well, the invention is a suture, but the basic and novel properties of the invention of that suture are as set forth in the district court's description, definition of the basic and novel properties. Which, yes, it's a suture, but it has this braid of dissimilar materials which contribute to the handleability and pliability of the product. So if I can use an analogy that might be sort of timely, think about Michael Phelps, Olympic swimmer. He's the fastest person in the water in the world. Why is that? Because he's got great cardiovascular strength, great muscle strength, great training. His physique, he's got these huge arms that act as levers. All these things make him incredibly fast in the water. And he enhances that by wearing one of these special body suits that the swimmers all wear now that reduce the drag in the water. That body suit is not affecting the basic things that go into making him the fastest swimmer in the world. It just enhances it. And it's similar here. We have an invention that they clearly appropriated using two dissimilar yarns, braiding them and intertwining contact to reach a certain level of handleability and pliability. Then all they do is do what everybody does on a braided suture and what our patent discloses you can do. They put a coating on it to take it to the next level. That does not affect the basic and novel properties of the invention. Did you file any kind of motion in Lemonet to preclude this argument from being made? From a trial standpoint, it's a fascinating case and you don't object to the claim construction nor to the instructions, but coatings, as you have stated, is well known in the art and it's used and the claims of the patent don't say anything about coating. It's just the interwoven structure and limited to that, your argument is that this other product is right on our claims. But the fight wound up being under coating changing the material benefits and was there any attempt to preclude that argument from being made because it wasn't relevant to the infringement inquiry? No, there was not. There was not. And in fact, we believe the fact that coatings are so ubiquitous that our effects actually helped, we believe, to prove our case. That's not the invention. The invention wasn't taking what people had done forever and ever, putting a coating on a suture to make it handleable and pliable, the invention was doing what they did with the braid of dissimilar materials. I'll reserve the rest of my time unless there are any questions. Okay, we'll save you rebuttal time then, Ms. Eldican. Thank you. Thank you, your honors. My name is Charles Saber and I represent the Appalese, Arthrex, and Pearsalls in this matter. First, I'd like to thank Ms. Eldican for her argument, which in all her courtesies that she gave throughout the litigation, which has continued from this appeal. Thank you. The only issue here is a substantial evidence test, and as the court knows, it should affirm unless there was a total failure of evidence to prove the plaintiff's case. I was struck by the briefs in this case. My tech filed a 51-page brief and virtually all of it was just arguing its view of the facts. Hardly a case cited except for perhaps the standards to be applied, made no legal arguments, simply arguing the facts. The first 24 pages of their reply brief, everything before the waiver argument, it shall be as a legal component to it. First 24 pages, again, just arguing the facts, they didn't cite a single case. In fact, our brief almost entirely is an argument about the facts, and that's simply what we have here is an argument about the facts. In deciding a case on substantial evidence, this court has said we can't ignore the case, we can't ignore the litigation that happened prior to getting here. I want to spend just a couple of minutes on that and start actually with the summary judgment motions that happened in this case. I think this helps answer the question, Judge O'Grady, that you asked. We moved for summary judgment. We relied principally on these generalized teachings in the area. Judge said, no, that's not enough. You have to show what fiber wire does to handleability and pliability. Defendants, that was their opposition. They never said, oh, no, no, you're asking the wrong question. It's only whether it affects this fiber mobility. They said there's a factual issue as to whether the fiber wire coating, the coating on fiber wire affects the suture's pliability and handleability. They relied upon two pieces of evidence. In fact, let me read what the judge said. This is in the appendix at 9475. It said defendants have pointed to language in the specification, that's us, the defendants, as well as other documents to demonstrate that it has become common industry practice to coat sutures to improve handleability and other characteristics. While not disputing industry practice, MITEC submitted evidence that fiber wire's particular coating did not have a material effect on handleability and pliability. That was their argument. They relied principally on two pieces of evidence. Their own expert who said it's just a small amount, therefore it can't have an effect on pliability. One of our experts, an orthopedic surgeon who did a subjective test where he checked the feel of the suture and how it tied knots, simply about what they call now the surface coating. They relied very heavily on the fact that Dr. Burks, our expert, said that the difference was merely subtle. He said much more, but he said that it was subtle. That was their opposition. The judge said, you're right, you've raised a factual issue on suture handleability and pliability. We're going to have a trial on that issue. That's what happened at trial. When Ms. Eldikin came and wrote in her brief and sat here today, isn't what happened at the trial. At the trial, my tech argued and argued vociferously for day after day after day that our coating did not affect suture handleability and suture pliability. They used the evidence that I just talked about in summary judgment. They said that the improvements in suture handleability came from heat treatment and from wipers in the manufacturing process. They tried to attack vigorously our expert testimony, which did the tests on fiber wire and showed it. That's what they told the jury why they should win. In fact, just go back to Dr. Burks for a second, the orthopedic surgeon who did the handleability test. They called his testimony extremely relevant. Extremely relevant was the words that they used to try and convince the jury that fiber pliability of the suture. Now, it is true. They also had another reason. They said it didn't get into the braid. That was another reason that it didn't affect handleability and pliability. We responded to that, as you indicated, Judge Lynn. They never once, not before trial, not in the jury instructions, not to the jury, never once said, we're asking the wrong question. Our evidence is irrelevant. We're not entitled to win our case by showing the effect on suture handleability and pliability. Quite the opposite. They said it just didn't do it. They lost. And we're here. And now, for the first time, after years and years and years of saying, oh, no, no, no, no, it's all about fiber wires handleability. This common practice, it doesn't matter. It's not the right question. Now they come in and say, of course it affects handleability and pliability. Everyone knows that. You haven't done anything. Well, that's not how they tried the case. And this court has said, as well as every court, that when you try the case that way, and that's how it's decided, all of this was left to the jury, as you noted, Judge O'Grady. They were given the instructions. They were told, you heard the evidence, you to decide. There was no confusion in this case. This was a deliberate way the case was tried. We won. And now, after the fact, MITEC is trying to change the question. If I may have just a minute or two on really what Judge Saris did was correct. I mean, she had defined it, and she said, if fiber wires coding affects the suture handleability and pliability, then you win. There's nothing terribly magic, by the way, about this basic and novel properties, which the judge found came from us. We're the ones who suggested this so as to, we didn't quite use those words, we said it was suture braided together to achieve improved handleability and pliability. It was pretty clear that that was the goal of the invention. There's no doubt. It's not in the claim language. Of course not. The patent office granted the patent based on the use of product category A, PET, and category B, PE. You chose the same products from category A and category B, and you put a product together that infringes the MITEC 446 patent. Then you add some coding to it, which makes it easier to use, which is known in the industry, and you don't argue that it's not known in the industry. So there's nothing novel about that. Then are allowed to argue that it changes the pliability and the handleability. How is that argument even relevant to the patent action? Because of the words consisting essentially of. Consisting essentially of changes this. If this were a comprising claim, everything you said would be exactly right. You can't get out of infringement by adding an element. But in a consisting essentially of case, and again, there's no dispute about this on the law, you must look to the specification to understand the basic and novel, and if the unlisted ingredient here, coding, materially affects the basic and novel, then there's no infringement. That's why the issue was relevant here. That's the case whether the language was changed for a completely different reason than the coding argument. That's absolutely correct, and that's why we were here. In fact, there was no dispute about that issue. But here's really the bottom line, frankly, as to why we're right, and again, this is a substantial evidence test. Ms. Alderkin just told you a story about how Fiber Wire was created. Unfortunately, for my tech, that was seriously in dispute. And what the actual testimony was, was that Fiber Wire was about trying to get this increased strength suture while maintaining sufficient knot security. Mr. Grafton, Mr. Lyons, Dr. Burkhart, the three people who were involved, didn't say a word about how this was an invention to improve pliability. And as far as handleability, the evidence in the case was that Fiber Wire didn't even have acceptable handleability until the coding was added. And that's really the key here. That was the evidence in this case, is that Fiber Wire doesn't even achieve the goals of the invention until the coding was added. Mr. Grafton said it, Mr. Lyons said it, Dr. Burkhart said it, and the experts, all the evidence showed it. And that's why we win. Of course the coding affects the basic and novel properties. Without the coding, you don't even get there. I mean, even if we got there with it, we would still win because it has a material effect, as the evidence showed. But this is the easiest of all cases, because there's substantial evidence in this record that we do not achieve the goals of this invention until the coding was added. Of course it affects the basic and novel properties of the invention. Without the coding, you simply don't even get there. That's the evidence in the case. That's what the jury heard. And as you said, Judge O'Grady, all of this was left to the jury. No objections to the jury instructions. This is the way it was all argued. MITEC was free to argue the case to the jury. It was all given to them. They heard all of this evidence, and they decided that the coding materially affected the basic and novel characteristics, and that's why they found no infringement. One just last word, and then I'll sit down. You made reference, Judge Lane, and you are correct. Even on this issue of does it permeate the braid, there clearly was evidence from our side. It was not the major issue that we tried, that's for sure, but they made the argument and we responded. We talked about the wicking effect. We talked about the pliability test itself and how that shows that there was an impact there. We showed about the fact how the coding filled in the voids, which is exactly to get to that intersection between the two fibers. So there clearly was evidence. When she made reference to our experts, she got it a little bit wrong. She was close, but a little bit wrong, because he looked at their experts' photos, and he says it's probably in there, but I'm not sure just by looking at the photos, so I think it gets in there because of these other things, because of the wicking effect and because of the way the coding worked in the manufacturing process. So the evidence clearly was there on that point, but I do emphasize that we don't really even need to get there because the evidence as this case was tried to the jury and as the trial that existed in this case shows without question that the fiber wire coding affects the basic and novel properties. It was left to the jury to decide it. They decided it, and that's why we ask Your Honor's to affirm the verdict. Let me ask you, because the consisting essentially wasn't added to the claim because of anything that had to do with the coding. That's correct. It had to do solely with the fiber structure, which was distinguished and continues to be from the prior art. So they do have an argument that whether a coding from the prior art is or is not administered really has nothing to do with the scope of the claim, which is limited consisting essentially of two classes of fibers in the suture. It is correct that the amendment was put in in response to a piece of prior art that did not deal with coding. That's correct. As Judge Saris commented, and I think absolutely correctly, it doesn't really matter why the amendment was made. The effect of the amendment is it added in the words consisting essentially of, and whatever the added ingredient was, if it affects the basic and novel characteristics, then it affects the basic and novel characteristics, and there's no infringement. The reason for the amendment, if we were talking about a doctrine of equivalence issue perhaps, but we're not, we're just talking about language that's in the claim, and consisting essentially of is in the claim. Well, I'm not so sure, because a good deal of precedent really exhorts those who are reading patents to look and see how terms got into the claims. Well, I agree with that, of course. That's correct. When one is doing claim interpretation, which is not the issue here, one can sometimes, of course, look to the prosecution history to understand the term. But a term is a term, and a term has a meaning. And here the term is consisting essentially of. If you added a limitation having to do with the color blue, but the prior art had to do with some other thing, the word color blue would still be in there. And the word consisting essentially of is in there. Again, no one is challenging here the claim interpretation. It's just the evidence. So we think that just once those words came in, then you have to go to the analysis of what does materially affect the basic and novel characteristics, just as Judge Saris ordered the trial to be on. And just as she explained, the question was whether coding affects those basic and novel characteristics, and specifically whether it affects suture handleability and pliability. My understanding of the effect of the consisting essentially of signal is that you look to the basic and novel characteristics of the invention. It doesn't signal that you look to the basic and novel characteristics of each of the listed elements. Is that correct? I think that's right. You've got to look to it. But let's think about what all patents are about. Virtually all patents are about trying to achieve a goal in a certain way. And this patent is no different. They're trying to achieve a goal. And if you have to add an ingredient that affects that goal, as clearly the evidence here shows, then plainly you affect the basic and novel characteristic. The closest case that actually I found to that is the PPG case, which I think Judge O'Grady made reference to. There the basic and novel characteristics involve the composition, the color, and the light transmission for tinted windshields. And the evidence only went to color and light transmission. It had nothing to do with the composition. Of course, because that's what the patent was driving to. And when they found the evidence that affected the results there, the fact that it didn't affect the composition, well, it didn't matter, because it was a patent about trying to improve these things. There, color and transmission. Here, pliability and handleability. And once the evidence shows that you impact that. And again, I repeat, this is a patent. In fact, if you go a little bit back in the patent, the patent talked about all the problems of the prior art, coding being among them. And in fact, the evidence in this case from the inventor was that he was trying to come up with something that didn't need coding, because coding had problems. One thing that I think is for sure, this is a patent that says good things and bad things about coding, as the judge said, and I think that's exactly right. But he was trying to eliminate coding. Eliminating coding was actually a part and parcel of what was going on here. In fact, the specification says that the advantages, the handleability, pliability advantages, come solely from the direct intertwining contact. That's not quite the words I used, but that's the point. It comes that way. We don't get those improvements from the direct intertwining contact, or at least the substantial evidence in this case, that we do not get the benefits of the improved handleability and pliability from the direct intertwining contact between our yarns. Mr. Grafton said it as clear as a bell. You didn't get that improvement until you added the coding. Dr. Burkhardt said, of course, we knew we couldn't get the advantages we needed until we added the coding, just like the prior art that was described in the patent. So clearly this is a patent that talks about coding, talks about the problems of coding, and this is a patent that if you have to do it the old way to get the result, as the evidence, the substantial evidence in this case shows, then clearly we submit that. I don't want to prolong this, but if you're telling us that they really didn't need to use your client, the mixture of fibers, why would they do so when that would invite a lawsuit? Our client's product, Your Honor, has nothing to do with what the Hunter patent was all about. We developed a whole new category of product called high-strain suture. It's not disputed that the two kinds of fibers are intertwined in the suture. That's not an issue at all. That's true. That's true, of course. They are intertwined, but what our product was all about was not about what the Hunter patent was about, which was about trying to get a more pliable and better handleable product while not making it too weak. We established a whole new category of suture, which was about super high-strength sutures, and in fact created the category that existed. That's what our invention was about. I didn't want to invite you to re-argue. Sure. But it really is very, very different, and in fact we don't use the teachings of the patent because the teachings of this patent are about getting improved handleability and pliability simply through the intertwining contact. We don't do that. We have to get coding to get those advantages. Okay. Thank you, Your Honor. Thank you, Mr. Sabur. That's where my pen went. There you go. Thank you. Ms. Alderkin. We respectfully disagree with Mr. Sabur's characterization of the record and of Fiber Wire product. When Arthrex had a problem with its all-PE suture and with its all-PET suture, it didn't solve the problem by just putting a coating on it. It solved the problem by using our invention, by braiding the two together, and then it put the coating on. There's some very interesting testimony about this in the record. Mr. Grafton was the developer of Fiber Wire, and at page 1523 in the record, he talks about how he chose the two materials and he varied their amounts to get the best properties, strength, knot security, tie-down, tactile feel, which mirrors what's in the patent at the bottom of column two, the idea of engineering a braid by choosing the materials. It's also important that Dr. Burkhardt, who was also involved in the development of Fiber Wire, when Mr. Grafton told Dr. Burkhardt about his idea, I'm going to braid these two different materials together, Dr. Burkhardt thought it was a killer idea, even though he knew at the time the product would have to be coded to be a commercial product, because the properties we're talking about with coating, those surface properties, it's ubiquitous on these bumpy braided braids. You're going to put a surface coating on it. But to get a braid that's good enough to even worry about coating in the first place, they had to use the Hunter invention. Do you disagree with Mr. Saver's argument that once the language is added, that there's no support for, legal support for limiting, essentially consisting of just to the reason for putting the language in there, the bioadhesive issue versus the coating? Well, to be perfectly honest, that's the argument we made at the Markman, and we lost that, and we haven't appealed it here. We do believe that Judge Sarris's definition of the basic and novel properties does accurately define those properties. When you read them all the way we read them, when you make sure to pay attention to every word in the description, the so as to language is very important. We don't believe you can just take part A and part D and ignore the rest. It's altogether, I think, that she did distill the basic and novel properties of the invention in her definition. But we do think it is important to look at how the consisting essentially of language came into the claims, and the fact that the patent expressly says that coating is an optional enhancement. That to us is strong evidence that coating is not part of the invention. The invention is just a braid of dissimilar materials to achieve these advantageous properties. Coating is an enhancement, and it cannot affect the basic and novel properties, and in this case it does not, and the evidence is undisputed on that. Even with 20-20 hindsight, if we could have presented that more clearly to the jury, the evidence on that is undisputed, and there is no evidence. It's against the credible weight of the evidence, the jury's verdict, and that's why we ask that Judge Sarris's order be reversed. Any more questions?